UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

FATIMA TSOULI-DENNEY,

           Plaintiff,

v.                                      Case No:

WATERMARK MEDICAL, INC.,

           Defendant.

_____ /

## **COMPLAINT**

    FATIMA TSOULI-DENNEY sues WATERMARK MEDICAL, INC, and alleges:

## **JURISDICTION AND VENUE**

    1.    This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the claims giving rise to this lawsuit involve a federal question and are brought pursuant to a federal statute.

    2.    This Court has supplemental jurisdiction over the remaining state law claims based on 28 U.S.C. § 1367, as the state law claims share all common operative facts with the federal law claim, and the parties are identical.

    3.    Venue is proper in this District based on 28 U.S.C. § 1391 because the acts giving rise to the issues involved in this lawsuit occurred within the boundaries of

this District. Specifically, Plaintiff was employed by Defendant whose principal place of business is in West Palm Beach, Florida.

## THE DEFENDANT

4.     Watermark Medical, Inc., ("*Watermark*"), is a Delaware corporation that maintains its principal place of business in West Palm Beach, Florida.  According to its website, "Watermark Medical is a recognized leader and early pioneer of home sleep testing. Since its inception in 2008, it has built a reputation for reliability, service quality, and innovation."

5.     Watermark further represents to the public that it "continuously strives to deliver sleep diagnostic solutions that are comfortable, accessible, and effective. ARES™ Home Sleep Test and its virtual cloud-based platform support efficient workflows and comprehensive, integrated, and customizable sleep diagnostic programs."

6.     Watermark further represents that it enables "physician/dental practices, clinics, and other healthcare providers with the ability to deliver easy, clinically effective home sleep diagnostic solutions to their patient base…[Watermark] delivers "direct to patient home sleep diagnostics through a licensed and accredited independent diagnostic testing facility—fast, efficient, and patient-focused."

7.     Watermark markets and sells sleep diagnostic devices to medical care providers and employer solution companies but does not sell such devices directly to

consumers. As such, the company employs individuals to meet with doctors and potential customers in the medical profession to market and sell its products.

## THE PLAINTIFF

8.      Ms. Tsouli is an individual that resides in and is a citizen of Scottsdale, Arizona. Until her unlawful and wrongful termination in July 2021, Ms. Tsouli was an employee of Watermark, employed by the company to market and sell its various sleep diagnostic products throughout the 48 contiguous states of the United States of America and in Canada.

9.      At the time of her wrongful termination, Ms. Tsouli was a National Director of Business Development and had received numerous awards, recognitions and distinctions by Watermark and its senior management for being the corporation's top salesperson between 2014 through 2021, when she was wrongfully terminated. Ms. Tsouli received the President's Club award annually due to her tremendous achievements.

10.     Ms. Tsouli was given two promotions that resulted in two raises and two new titles within the last year of her employment due to her carrying Watermark's profits by leading all other producers in sales revenue during COVID.

11.     Thereafter, Ms. Tsouli was informed that the substantial revenues generated from her efforts were so remarkable that Watermark was able to pay commissions to several members of its national sales team and secure their job positions.

## HISTORY OF WATERMARK'S MISCONDUCT

12.     Ms. Tsouli experienced numerous incidences of discrimination and harassment based on her gender, religious preferences, and national origin, during her tenure with Watermark, as the corporation had a proclivity for tolerating and condoning discriminatory and reprehensible conduct from its management level employees, specifically as it pertains to gender and religion/national origin.

13.     Ms. Tsouli observes the Muslim faith, along with the traditions of the Muslim religion.  While Ms. Tsouli is faithful to her religion, she makes it a point to separate her personal beliefs from her work.

14.     Ms. Tsouli nevertheless experienced religious intolerance, and discriminatory and psychologically abusive behaviors from co-workers and ultimately, Watermark itself based on its tolerance and condoning of discriminatory and abusive behaviors from its male employees against female employees – in this case, Ms. Tsouli.

15.     To provide example of the discriminatory conduct, in January 2018, Watermark had an in-person national sales meeting in which Ms. Tsouli was being recognized (for the third time) as Watermark's top sales representative for the fiscal year ending 2017.

16.     Unfortunately, during the very same corporate event, Ms. Tsouli was approached by Jonathan "Shane" Carithers (a white, male Watermark employee) who asked her how she was able to win such an award because he "didn't know terrorists could sell", and that he was under the impression Muslims were terrorists and only good at "making bombs", among other discriminatory and unlawful remarks.

4

17.     Carithers proceeded to ask Ms. Tsouli if she was happy about the "Trump Muslim ban" because he (Carithers) felt it was a great decision and Carithers proceeded to laugh at and jeer Ms. Tsouli in front of others during the national sales meeting.  Carithers then proceeded to encroach upon Ms. Tsouli's personal space by getting close to her face and saying the word "boom" ....  implying that a bomb was going off as he continued to jeer and laugh.

18.     Mr. Carithers made these comments in front of several employees including, Watermark managers Dave Bonenko and Benjamin Thomas, both of whom joined in laughter at the derogatory, humiliating, and demeaning remarks Carithers made about Ms. Tsouli.

19.     Sean Heyniger - who is the senior most officer of Watermark[1] - found Ms. Tsouli crying and attempting to compose herself from such humiliation.  Instead of showing compassion and support for his employee and top performer, Heyniger chose to make excuses for Carither's unprofessional and reprehensible behavior.

20.     Heyniger not only disregarded the impact of Carither's improper conduct, but he also told Ms. Tsouli that he was not going to discipline Carithers or correct his behavior because in his view, this was just a "guy being a guy", Carithers had previously sued his prior employer, he was too valuable to lose, and that Watermark had no interest in being involved in a lawsuit concerning Carithers. Heyniger essentially told Ms. Tsouli to "suck it up" and go about her business.

---

[1] Mr. Heyniger was the President and Chief Executive Officer of Watermark, in addition to being its principal shareholder and the Chairman of its board of directors.

21.     Ms. Tsouli made a formal complaint with Watermark's Human Resources Department because she knew, based on the intolerant, white male dominated culture of Watermark, that this situation was bound to occur again if the Human Resources Department did not take some form of action to correct the behavior.

22.     While the matter was documented and discussed, Ms. Tsouli was informed by the Human Resources Department, that Ms. Tsouli's supervisors, Dave Bonenko and Heyniger, that Watermark was ***not going to take any disciplinary action against*** Carithers due to the fact that Carithers had other racist text messages in his possession from other Watermark managers, and if they tried to fire him, he would attempt to ruin other Watermark managers or employees alongside him.

23.     Watermark's failure to act empowered Carithers to continue making pejorative, racist and religiously intolerant comments about Ms. Tsouli on national sales calls, group chats and email chains, all aimed at antagonizing and humiliating her because she was a Muslim woman; this unlawful behavior continued for five months until Carithers ultimately left Watermark to take a position with another company.

24.     In addition to enduring abusive, racist, and religiously intolerant comments from co-workers, Ms. Tsouli was routinely denied promotions and other advancements, despite her remarkable success as the corporation's top performer in sales, in favor of white male counterparts, all of whom had a history of weaker performance, among other issues.

25.     Ms. Tsouli was the top sales representative at Watermark/SleepMed every year during her tenure with the company.

26.     Therefore, Ms. Tsouli was asked to train all new sales representatives hired by Watermark.

27.     Despite receiving accolades for her job performance, promotions that she sought (such as a Vice President position), were given to male counterparts – white males such as Gary Lauderbach, Dave Bonenko, Roger Milligan, and Daniel Merkin were given positions above Ms. Tsouli, despite her superior performance.

28.     For example, Ms. Tsouli and Roger Milligan (a white male), both of whom held the same position, were up for an opportunity to be promoted to Regional Sales Manager.

29.     Milligan had a history of alcoholism, getting into bar fights, and other public displays of bad behavior, among other issues, in addition to underperforming in his position as a sales representative.

30.     Nevertheless, Milligan was promoted to Regional Sales Manager and elevated above Ms. Tsouli as her direct supervisor.

31.     This was not surprising given the lack of female executive and management level employees Watermark had – which exclusively consisted of all white males.

32.     To compound matters, Milligan had a history of aggression towards Ms. Tsouli often using profanity and pejorative female references to refer to Ms. Tsouli directly while speaking to her and in conversations with others.

7

33.     Milligan had an addiction to spewing obscenities, screaming, and threatening Ms. Tsouli while he was her direct supervisor; the behavior was witnessed by multiple Watermark employees, and individuals from multiple vendors and companies with whom Watermark did business.

34.     As another example, Heyniger, Watermark's CEO, engaged in unbefitting and intrusive conversations with Ms. Tsouli about tasteless personal female related matters such as her age or the fact that she did not have children. He also proceeded to interrogate her about her reasons for not starting a family "like most women would do", in addition to other matters that made Ms. Tsouli particularly uncomfortable.

35.     Ms. Tsouli did not have a close or personal relationship with Heyniger and nothing stopped him from aggressively continuing his pursuit of these unacceptable conversations (often when he and Ms. Tsouli were alone).  Ms. Tsouli often felt that Heyniger had ulterior motives in pursing these conversations with her.

36.     These conversations were particularly uncomfortable since Ms. Tsouli had miscarriages and did not want to discuss such intimate and personal matters with her male boss, with whom she had no relationship with, other than being his female employee.

37.     As an additional example, in November of 2019, Watermark hired Daniel Merkin as the Vice President of Sales, which was another opportunity denied to Ms. Tsouli despite her top performance and tenure with Watermark; Merkin was installed as Ms. Tsouli's direct supervisor.

8

38.     Merkin commenced harassing and tormenting Ms. Tsouli almost immediately upon becoming her supervisor.   Merkin's behavior was so egregious that Ms. Tsouli had to seek therapy to cope with the stressful and hostile work environment Watermark allowed to exist during the tenure with the company.

39.     Ms. Tsouli started therapy the very first month she began working with Merkin, and she continues with that therapy to recover from the emotional, psychological and even physical harm caused by Watermark's unlawful conduct and violation of her rights.

40.     From November of 2019 until the date of Ms. Tsouli's wrongful termination, Merkin verbally abused and harassed her, and created a hostile work environment for Ms. Tsouli by, among other things:

   a. Aggressively disparaging and questioning Ms. Tsouli about her ethics without providing any evidence to support the accusation.

   b. Aggressively and continuously making false allegations about Ms. Tsouli taking kickbacks and other wise engaging in inappropriate behavior with customers and potential customers of Watermark because he did not believe that Ms. Tsouli could be successful at her trade without engaging in some level of impropriety.   Again, Merkin made these accusations without any evidence to support his flawed opinions.

   c. Merkin routinely contacted Ms. Tsouli's clients and contacts making disparaging remarks and raising questions, issues and concerns about her ethics and behavior—all without any evidence to support his opinions—to interfere with those relationships and impair Ms. Tsouli's success as Watermark's top sales representative.

9

d. Merkin made numerous false reports to members of Watermark's senior management in his effort to interfere with and impair her ability to successfully perform her job.

e. Merkin denied Ms. Tsouli access to various business conventions and other sales focused events – conventions and events that she has always had the ability to attend to create business opportunities for Watermark – in furtherance of his attempt to impede her success so that he can terminate her.

f. Merkin routinely accused Ms. Tsouli of dishonesty, often questioning her travel (even though business travel was at the heart of her job responsibilities), and questioning her travel expenses, among other things that were never an issue until he became her supervisor.

41.     Merkin created a contentious, unbearable, and hostile work environment for Ms. Tsouli, which lead her to apply for positions in other business sectors, because she knew that senior management at Watermark would not take any action to correct this behavior (based on the company's history of tolerance for hostile and discriminatory behavior).

42.     Interestingly, Watermark never formally reprimanded Ms. Tsouli about the issues enumerated above, despite Merkin's tremendous efforts to disparage and remove her.

43.     Ms. Tsouli's quest to find a new job was successful.  She gave notice of her decision to resign from her employment to Watermark in May 2020.

44.     Jack Fiedor, Watermark's Chief Financial Officer, immediately contacted Ms. Tsouli to tell Ms. Tsouli that she was too valuable to the corporation

and that he did not want to accept her resignation – to quote Fiedor, "we are not letting you go without a fight."

45.     Ms. Tsouli was willing to reconsider her resignation if Watermark would address the issues she reported in relation to Merkin and other concerns about how she had been treated, harassed, and discriminated against by male employees over the past several years.  Fiedor and Heyniger assured Ms. Tsouli that the issues would be addressed. In exchange for her willingness to remain employed by Watermark, Ms. Tsouli was promoted to National Director of Business Development with an increase in pay.

46.     Ms. Tsouli withdrew her resignation and advised the company that offered her the new position that she would be remaining with Watermark, essentially eradicating any future opportunity for her to work for that company.

47.     Watermark returned to putting its head in the sand in terms of corporate misconduct once they got what they wanted from Ms. Tsouli.

48.     Merkin immediately reverted to his antics of unlawful and harassing behavior and was joined by other male Watermark employees.  For instance, after Watermark's National Sales Meeting in January of 2021, the company's Northeast Sales Representative, Kevin Sundra, referred to Ms. Tsouli using pejorative female references (on speakerphone) during a phone call with Milligan, for which Sundra was never disciplined nor reprimanded.

49.     Sundra also accused Ms. Tsouli of taking kickbacks from customers and otherwise engaging in unethical business practices, although he had absolutely no evidence to support his statements.

50.     Ms. Tsouli once again reported these issues with the Human Resources Department, and with senior managers, including Heyniger and Fiedor.

51.     Several telephone conferences and conversations were had wherein Ms. Tsouli was told by Heyniger and Fiedor that she needed to "back off" on her complaints and to simply focus on her work because Watermark was not going to terminate Merkin or anyone else for their behavior.

52.     Heyniger threatened Ms. Tsouli, stating that if she continued to report complaints against Merkin or continued to complain about Merkin harassing and bullying her, Heyniger would force her to draft a report and plan on how she can learn to get along with Merkin.  Heyniger further threatened that if Ms. Tsouli could not devise a plan to resolve her own issues with Merkin, there would be a severe price to pay.

53.     Ms. Tsouli refused to backdown from her complaints, especially since Fiedor and Heyniger previously told her that they would address these issues when they convinced her to withdraw her resignation and remain with the company in May 2020.

54.     In July 2021, Ms. Tsouli was invited to fly from her home in Scottsdale, Arizona to West Palm Beach, Florida for a dinner meeting with Heyniger and Fiedor, presumably to discuss sales performance.  In fact, Ms. Tsouli was expressly told by

Heyniger's office that this meeting would be a dinner meeting to discuss the great opportunities and great job she was doing with her business partners, with no mention of her complaint against Merkin.

55.     Upon arrival, Ms. Tsouli was advised that the dinner meeting was called to discuss the harassment complaints she raised against Merkin and Milligan; here, Plaintiff was threatened and advised that they would not "let the men go" for their harassment.

56.     Heyniger and Fiedor threatened Ms. Tsouli that if she continued to raise harassment complaints against the two men, Watermark would be forced to use the myriad of issues and concerns that Milligan and Merkin had expressed about her performance – a vague reference of which Ms. Tsouli had no information since she was never reprimanded.

57.     Fiedor, in particular, told Ms. Tsouli that "if you do not leave this alone . . . .then maybe we have something against you."

58.     Naturally, "the dinner" became extremely uncomfortable and it was apparent that the all-male executive team tolerated and supported the harassment against the Plaintiff and perpetuated the harassment by failing to act.

59.     That same evening, however, Heyniger and Fiedor directed Ms. Tsouli to record and notate all her harassment and discriminatory complaints against Merkin and Milligan.

60.     Ms. Tsouli complied with their request, as she was hopeful that Watermark would act against the abuse she had experienced from her male counterparts.

61.     However, this was unfortunately a smokescreen, and the following week she was terminated from Watermark.  Ms. Tsouli was told that she was being terminated based on allegations that she received illegal kickbacks, that she was insubordinate, and that she made antisemitic remarks about Merkin.

62.     Ms. Tsouli's termination was particularly confounding since she had sought to resign from Watermark and only remained with the corporation because of representations made by Fiedor and Heyniger about her being an indispensable employee with an excellent track record with the corporation.

63.     Ms. Tsouli was also confused because she never made an antisemitic remark to Merkin (she also was not aware of Merkin's religious affiliations), was never disciplined for making an antisemitic remark, she had never been accused of taking an illegal kickback, and in fact, she has never received any formal disciplinary action related to her job performance.

64.     Ms. Tsouli retained legal counsel to assist her with her separation of employment from Watermark considering the comments that were made about her taking illegal kickbacks and engaging in illegal behavior.

65.     Ms. Tsouli retained Attorney Leslie Mariotti of the law firm of Pietragallo, Gordon, Alfano, Bosick & Raspatini, LLP to make inquiry to Watermark about the "illegal kickbacks," and other issues surrounding her termination.

14

66.     Attorney Mariotti demanded that Watermark immediately produce all evidence it had concerning the "illegal kickbacks" and other illegal behavior that Ms. Tsouli was being accused of.

67.     Watermark immediately withdrew its assertion that Ms. Tsouli took an illegal kickback or engaged in any illegal behavior, and in fact admitted that it had no evidence of such conduct.

68.     Upon information and belief, Watermark terminated Kevin Sundra and Daniel Merkin because the information supplied by both (most of which formed the basis of Watermark's decision to terminate Ms. Tsouli) was false.

## GENERAL ALLEGATIONS

69.     All conditions precedent to filing this lawsuit have transpired, have expired, have elapsed, or have been effectively waived.

70.     Fatima Tsouli-Denney has retained the services of éclat Law, PA to represent her in this lawsuit and is obligated to pay the law firm a reasonable fee for its services and to reimburse the firm for all expenses incurred in pursuing justice on her behalf.

## COUNT I: ACTION FOR DECLARATORY RELIEF

71.     Ms. Tsouli adopts and realleges the allegations in paragraphs 1 through 70 above as if fully stated in this claim.

72.     This is an action for declaratory relief under the federal Declaratory Judgment Act, 28 U.S.C §2201(a).

73.     A genuine issue exists concerning the basis for Watermark's termination of Ms. Tsouli's employment, and in particular, Watermark's allegations that she took illegal kickbacks engaged in other illegal behavior and made pejorative remarks about Daniel Merkin's religious affiliation.

74.     Watermark has been inconsistent about the basis for its termination of Ms. Tsouli's employment, including being inconsistent about her alleged misconduct. One moment Watermark makes strong allegations about her illegal behavior, then withdraws it, then reasserts the behavior.

75.     Ms. Tsouli, on the other hand, has been consistent in her position that she has not engaged in any illegal behavior (including taking an illegal kickback), she did not make disparaging remarks about Daniel Merkin's religious affiliation, and did not otherwise engage in any of the misconduct that forms the basis of Watermark's decision to terminate her employment.

76.     Ms. Tsouli seeks this Court's intervention to determine and make a declaration regarding the following issues:

   a.  Whether Ms. Tsouli accepted an illegal kickback from Watermark customers, potential customers, vendors, and others with whom Watermark did business at the time of Ms. Tsouli's employment.

   b.  Whether Ms. Tsouli engaged in any illegal activity that supports Watermark's decision to terminate her employment.

   c.  Whether Ms. Tsouli directed antisemitic or other religious intolerant remarks towards Daniel Merkin as suggested by Watermark.

   d.  Whether Watermark was justified in its decision to terminate Ms. Tsouli's employment.

e.  Whether Watermark violated federal and state laws concerning Ms. Tsouli's employment.

77.  Ms. Tsouli has no adequate remedy at law and thus requires this Court's intervention to determine these very important issues.

WHEREFORE, FATIMA TSOULI-DENNEY requests that this Court award her all rights, remedies, and relief available to her under Declaratory Judgment Act, 28 U.S.C §2201(a) and the common law interpreting this statute.

## COUNT II: VIOLATIONS OF THE FEDERAL CIVIL RIGHTS ACT

78.  Ms. Tsouli adopts and realleges the allegations in paragraphs 1 through 70 above as if fully stated in this claim.

79.  This is an action for damages brought pursuant to Title 42 of the United States Codes, Section 2000e, et seq. (known as Title VII of the Civil Rights Act of 1964, as amended, or "Title VII").

80.  All conditions precedent to the filing of this action have been fulfilled, including the initial filing of charges with the Equal Employment Opportunity Commission ("*EEOC*") and the receipt from the EEOC of the Notice of Right to Sue letter for Charge No. 510-2022-01772, alleging discrimination based on sex, religion, and national original, as well as retaliation. The Right to Sue letter for the above referenced charge is attached hereto as Exhibit A and is incorporated herein by reference.

81.  At all times material to this claim, Watermark was Delaware corporation registered to do business in the State of Florida and employed well over 15 employees.

82.     Watermark discriminated against Ms. Tsouli based on her gender, religious preferences, and national origin in violation of the Civil Rights Act.

83.     Ms. Tsouli, who is a Muslim female, experienced religious intolerance, and discriminatory abuse from her co-workers and ultimately Watermark itself since the company tolerated and condoned the discriminatory behavior of its employees as alleged in paragraphs 12 through 70 above.

84.     As stated in paragraphs 12 through 70 above, Ms. Tsouli reported this unlawful behavior to Watermark's Director of Human Resources, its Chief Executive Officer, and its Chief Financial Officer, all of whom refused to take action to correct this unlawful behavior.

85.     Instead, Watermark elected to terminate Ms. Tsouli's employment for raising concerns about the discriminatory conduct of her colleagues in violation of Title VII, specifically 42 USC U.S.C. § 2000e-2(a).

86.     Prior to her termination, Plaintiff was consistently denied promotions and other advancement in Watermark, despite her tremendous success as the corporation's top performer in sales.

87.     Plaintiff noticed that the promotions that she was eligible for were always given to white male employees, and all of whom had lower job performance than the Plaintiff.

88.     Again, the Plaintiff is a Muslim female and almost all of Watermark's management-level employees are white male employees.

89.     Based on these facts, including those described in detail in paragraphs 12-70 above, Plaintiff is informed and believes that Watermark engaged in an unlawful employment practice in violation of the Federal Civil Rights Act, by discriminating against Plaintiff, solely based on her gender, religious preferences, and national origin, in determining which employees to award advancement opportunities to within the company and in making (wrongful) decisions to terminate Plaintiff.

90.     As a direct and proximate result of Watermark's conduct described above, Plaintiff was damaged in that she was deprived of a better paying position, the chance of advancement within the company, and other gainful employment issues.

91.     As a direct and proximate result of Watermark's conduct described above, Plaintiff has also suffered emotional distress, mental anguish, and loss of dignity, because of which Plaintiff has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, FATIMA TSOULI-DENNEY, demands judgment against the Defendant, WATERMARK MEDICAL, INC., for damages, attorneys' fees and costs, plus interest and for such other and further relief this Court deems just, equitable, and proper.

## COUNT III: VIOLATIONS OF FLORIDA'S CIVIL RIGHTS ACT

92.     Ms. Tsouli adopts and realleges the allegations in paragraphs 1 through 70 above as if fully stated in this claim.

93.     This is an action for violation of Florida's Civil Rights Act, specifically Fla. Stat. § 760.10.

94.     At all times material to this cause of action, Watermark employed 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

95.     Ms. Tsouli was hired as an employee of Watermark in March 2014; she was hired to perform the job duties described in paragraphs 8-11, among other things.

96.     Ms. Tsouli is a Muslim female and almost all of Watermark's management-level employees are white male employees.

97.     Unfortunately, over the course of Ms. Tsouli's employment, Watermark discriminated against her based on her gender, religious preferences, and national origin in violation of the Civil Rights Act as described in paragraphs 12 - 70 above.

98.     Ms. Tsouli raised her concerns with senior managers, including Watermark's CEO and CFO, and filed complaints with Watermark's Human Resources Department about the discrimination and harassment that she endured as further described in paragraphs 12 - 70 above.

99.     Ms. Tsouli was ultimately informed that Watermark was not going to take any disciplinary action against the perpetrators as described above.

100.    Watermark ultimately terminated Ms. Tsouli's employment in retaliation for raising concerns about the discriminatory conduct of her colleagues in violation of Florida's Civil Rights Act, specifically Fla. Stat. § 760.10.

101.    Prior to her termination, Ms. Tsouli was consistently denied promotions and other advancement in Watermark, despite her tremendous success as the corporation's top performer in sales, as described in paragraphs above.

102.    Ms. Tsouli noticed that the promotions that she was eligible for were always given to white male employees, and all of whom had lower job performance than Ms. Tsouli.

103.    Based on these facts, Ms. Tsouli is informed and believes that Watermark engaged in an unlawful employment practice in violation of the Florida Civil Rights Act, by discriminating against her, solely based on her gender, religious preferences, and national origin, in determining which employees to award advancement opportunities to within the company.

104.    As a direct and proximate result of Watermark's conduct described above, Plaintiff was damaged in that she was deprived of a better paying position, the chance of advancement within the company, and other gainful employment issues.

105.    As a direct and proximate result of Watermark's conduct described above, Ms. Tsouli has also suffered emotional distress, mental anguish, and loss of dignity, because of which Ms. Tsouli has been damaged in an amount to be proven at trial.

106.    All conditions precedent to the filing of this action have been fulfilled, including the initial filing of charges with the EEOC (including the appropriate state equivalent) on or about December 27, 2021, and the receipt from the EEOC of the Notice of Right to Sue letter for Charge No. 510-2022-01772, alleging discrimination based on sex, religion, and national original, as well as retaliation. *See* Right to Sue letter attached hereto as Exhibit A.

WHEREFORE, FATIMA TSOULI-DENNEY demands judgment for general damages, special damages, including lost earnings, for costs and reasonable attorneys' fees, and all remedies available to her under the Florida's Civil Rights Act, specifically Fla. Stat. § 760.10, together with such further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a jury trial on all triable issues above.

**RESERVATION OF RIGHT TO AMEND COMPLAINT**

Plaintiff reserves the right to file amendments to this complaint as may be appropriate.

Respectfully submitted,

*/s/ Kevin K. Ross-Andino*
Kevin K. Ross-Andino, FBN 66214
kevin.ross@eclatlaw.com

*éclat Law, PA*
307 Cranes Roost Blvd., Suite 2010
Altamonte Springs, FL 32701
Office: (407) 636-7004

*Counsel for Plaintiff*